UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE STICKLES and MICHELE RHODES, <br><br> Plaintiffs, <br><br> v. <br><br> ATRIA SENIOR LIVING, INC. and ATRIA MANAGEMENT COMPANY, LLC, <br><br> Defendants. | No. C 20-09220 WHA <br><br> **ORDER RE MOTION TO CERTIFY CLASS** |

### INTRODUCTION

In this wage-and-hour action, plaintiff George Stickles alleges defendants misclassified his position as exempt from California overtime, meal break, and rest break rules under the outside salesperson exemption. Plaintiff Stickles seeks to certify a class of former and current employees in the same position whom defendants classified as exempt outside salespersons. For the reasons that follow, this order **CERTIFIES** the following class: CSDs who did not sign arbitration agreements and whom defendants classified as exempt outside salespersons from the date plaintiff Stickles began his employment with defendants through September 29, 2019. For now, certification applies solely to this issue: whether defendants properly classified CSDs as exempt outside salespersons. Certification of the underlying wage-and-hour claims is **HELD IN ABEYANCE**.

**STATEMENT**

Plaintiffs George Stickles and Michele Rhodes each worked as a "Community Sales Director" for defendants, Atria Senior Living, Inc. and Atria Management Company, LLC. Plaintiff Stickles worked for defendants from April 2018 to August 2018, and plaintiff Rhodes worked for defendants from October 2019 to April 2020. Defendants were affiliated entities that operated 46 senior living communities throughout California. Defendants leased living spaces at their communities to senior citizens.

Each community employed at least one full-time CSD like plaintiffs. The job description that plaintiffs signed provided, in part, the following essential functions of the CSD position:

- Primarily focused on sales activities outside the community by making sales calls to potential residents, referral sources and other resources.

- Meet or exceed weekly company/community sales standards.

- Respond to telephone inquiries, remotely and in real time where possible, and conduct walk-in and scheduled tours with prospective residents or interested parties.

- Develop and maintain relationships with any and all potential referral sources and conduct on-going field visits.

(Stickles Dep., Exh. 5; Rhodes Dep., Exh. 6). Defendants had CSDs sign this job description until September 30, 2019. On that date, defendants updated the CSD job description (Bedell Dep., Exh. 2 at 2).

CSDs reported to and were supervised by the executive directors at their respective communities. CSDs' ultimate goal was to attract seniors to their living communities. CSDs had to record all their sales activities every day in a "Customer Relationship Management" database by choosing from a common set of categories. This common database did not track CSD hours, but it did track each individual CSD's daily activities. Defendants paid flat salaries to CSDs, and defendants paid commissions to CSDs based on total company revenue. Defendants did not pay CSDs for overtime and did not provide CSDs with meal or rest breaks. But because defendants classified CSDs as "outside salespersons," CSDs were exempt from overtime and meal and rest break rules. Cal. Lab. Code §§ 226.7(e), 1171.

2

Like the putative class members he seeks to represent, plaintiff Stickles earned a flat salary and was not provided overtime pay, meal breaks, or rest breaks. Although plaintiff Stickles did not sign an arbitration agreement, 49 of the approximately 154 CSDs whom defendants classified as exempt during the proposed class period signed arbitration agreements.

Thus, plaintiff Stickles alleges violations of California's meal break, rest break, and overtime compensation rules. Cal. Lab. Code §§ 226.7, 510, 512, 1194. Plaintiff Stickles also makes derivative claims for wage statement and waiting time penalties. *Id.* §§ 201, 202, 203, 226.

Plaintiff Michele Rhodes, however, signed an arbitration agreement. The parties filed a joint stipulation stating that plaintiff Rhodes agreed to dismiss her individual and class claims due to the arbitration agreement. The parties also filed a first amended complaint reflecting this change. Now, she brings only a representative claim under the Private Attorney General Act of 2004 for civil penalties based on overtime, meal break, rest break, and wage statement violations resulting from her alleged misclassification. Cal. Lab. Code § 2698, *et seq.*

Thus, for the remainder of this order, "plaintiff" refers only to plaintiff George Stickles.

In the instant motion, plaintiff seeks to certify a class of "[a]ll persons employed by Defendants in the position of Community Sales Director in California and classified as exempt from December 18, 2016 through December 31, 2019 who did not execute an arbitration agreement with Defendants" (Proposed Ord. 1). This order follows full briefing and a telephonic hearing.

For the reasons that follow, this order **CERTIFIES** the following class: CSDs who did not sign arbitration agreements and whom defendants classified as exempt outside salespersons from the date plaintiff began his employment with defendants through September 29, 2019.

For now, certification applies solely to this issue: whether defendants properly classified CSDs as exempt outside salespersons. We will revisit possible certification of the underlying wage-and-hour claims after we resolve the certified issue. At that point, the Court will be better informed to determine how plaintiff might establish class-wide overtime liability.

3

1   Accordingly, certification of the meal break, rest break, overtime, wage statement, and waiting
2   time claims is **HELD IN ABEYANCE**.

**ANALYSIS**

Certification of a class action is governed by FRCP 23. Plaintiff must show that the proposed class action satisfies each of the four prerequisites of FRCP 23(a) and one of the three requirements of FRCP 23(b). FRCP 23(a) requires plaintiff to show:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

In addition, plaintiff seeks certification under FRCP 23(b)(3), which requires he show:

> the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

A district court must do a rigorous analysis to determine if the requirements of FRCP 23 are satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). "Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id*. at 351 (cleaned up).

**1.     NUMEROSITY.**

The proposed class is "[a]ll persons employed by Defendants in the position of Community Sales Director in California and classified as exempt from December 18, 2016 through December 31, 2019 who did not execute an arbitration agreement with Defendants" (Proposed Ord. 1). Of the approximately 154 CSDs whom defendants classified as exempt during the proposed class period, only 49 signed arbitration agreements (Dkt. No. 31-2, Exh. 5, Int. Ans. Nos. 1, 4). Thus, the proposed class likely exceeds 100 individuals. In turn, the class

4

we certify today — the time period for which is approximately half that of the proposed class — likely exceeds fifty individuals. Numerosity is satisfied.

### 2. COMMONALITY.

The commonality element requires that there be a common contention among all class members which is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 564 U.S. at 350.

Here, the common misclassification contention is necessarily central to the class members' claims because no class member can recover if defendants' classification of CSDs was proper. And defendants rely on the classification of CSDs as exempt outside salespersons as an affirmative defense to all of plaintiff's wage-and-hour claims (Dkt. No. 28 at 12). Defendants do not argue that commonality is not satisfied. Commonality is satisfied.

### 3. TYPICALITY.

Typicality requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." FRCP 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "'Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). "Under [FRCP 23(a)(3)]'s permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "The commonality and typicality requirements of [FRCP] 23(a) tend to merge." *Gen. Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n. 13 (1982).

Here, plaintiff's defining contention is that defendants improperly classified him as an exempt outside salesperson. That is also the defining contention of the class. Defendants do

5

not argue that plaintiff's claims are unique from those of the class or that defendants would have defenses unique to some class members. Rather, defendants assert that plaintiff's experience was different than that of the putative class members. Specifically, defendants argue that plaintiff engaged in outside sales activities far less than the putative class members did, which defeats typicality (Opp. 22).

But defendants allegedly injured both plaintiff and the putative class members by failing to provide them with overtime pay, meal breaks, and rest breaks. This alleged injury arose from defendants' conduct of classifying plaintiff and the putative class members as exempt. Thus, plaintiff and the putative class members allege the same injury arising from the same conduct. Although there may be some differences between plaintiff's experiences and those of the putative class members, plaintiff's claims are reasonably co-extensive with those of the putative class members. Typicality is satisfied.

**4. ADEQUACY.**

The final requirement of FRCP 23(a) is that the class representative fairly and adequately protect the interests of the class. Thus, the representative plaintiff and class counsel cannot have conflicts of interest with the putative class members and must prosecute the action vigorously on behalf of the class. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Here, plaintiff's lead counsel submitted a declaration describing his qualifications and extensive experience in wage-and-hour litigation, including serving as class counsel in numerous wage-and-hour cases (Hayes Decl. ¶ 20). His law partner also has extensive experience in wage-and-hour litigation and would serve as class counsel (*ibid.*).

Thus far, plaintiff's counsel has vigorously litigated this case. In support of the instant motion, plaintiff's counsel deposed two of defendants' employees who hold the position of "Vice President of Sales" (Bedell Dep.; Floyd Dep.) and one employee in defendants' "Business Optimization Team" who helped to create the commission and bonus plan documents that apply to all CSDs in California (Heffernan Dep. 13–14). Plaintiff's counsel also retained an expert, Dr. Brian Kriegler, Ph.D. statistics, who used defendants' Customer

6

Relationship Management database to provide statistics on the activities that CSDs performed between January 2017 and December 2019 (Krieger Decl. ¶¶ 8–10).

Plaintiff submitted a declaration stating that he understands his duty to always consider "the best interests of the class before his own" and to actively participate in the lawsuit (Stickles Decl. ¶ 11). He also declared that he has no conflicts of interest with the putative class members (*id.* ¶ 13).

But plaintiff is adequate to represent only those CSDs who did not sign arbitration agreements and whom defendants classified as exempt from his first date of employment through September 29, 2019, as follows. A signature on a job description is unnecessary to bind an employee to its terms. What is necessary, however, is that the employee is on notice of the job description and continues to work for his employer, thereby assenting to the job description. Here, plaintiff could not have been on notice of the updated job description because he was not a CSD on or after the date of the update (September 30, 2019) (Stickles Decl. ¶ 2). Thus, there is no plaintiff adequate to represent CSDs classified as exempt on or after September 30, 2019.

Defendants have pointed to no reason to believe that plaintiff's counsel has any conflicts of interest with the putative class members or that plaintiff and plaintiff's counsel would not vigorously prosecute this action on behalf of the certified class; this order finds none. Adequacy of representation is satisfied.

### 5. FRCP 23(B)(3).

To certify a class under FRCP 23(b)(3), plaintiff must show that "the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "This analysis presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3). In contrast to Rule

23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues." *Hanlon*, 150 F.3d at 1022. Underlying both predominance and superiority is "a concern for judicial economy." *Wolin*, 617 F.3d at 1176.

Our court of appeals has held that, while an employer's policy of uniformly classifying a group of employees as exempt outside salespersons is a relevant factor in the FRCP 23(b)(3) analysis, "it is an abuse of discretion to rely on such policies to the near exclusion of other relevant factors touching on predominance." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 955 (9th Cir. 2009).

Our court of appeals has also recognized, however, that class certification is appropriate where a plaintiff shows "(a) company-wide policies governing how employees spend their time, or (b) uniformity in work duties and experiences that diminish the need for individualized inquiry." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 947 (9th Cir. 2009) (citation omitted).

Here, plaintiff argues that there is sufficient uniformity in work duties and experiences among CSDs to diminish the need for individualized inquiries (Br. 19; Reply Br. 3–8), and there is common proof of the actual work that CSDs performed (Reply Br. 8–10).

### A.   THE OUTSIDE SALESPERSON EXEMPTION.

Before addressing the predominance inquiry, this order must discuss the outside salesperson exemption. Under California law, employees who are "outside salespersons" are exempt from meal break, rest break, and overtime protections. Cal. Lab. Code §§ 226.7(e), 1171. An "outside salesperson" is an employee who:

> customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities.

Wage Order 7-2001 § 2(J) (Cal. Indus. Welfare Comm'n 2001) (codified at Cal. Code Reguls. tit. 8 § 11070).

The California Division of Labor Standards Enforcement, the state agency charged with enforcing the wage orders, has explained the rationale behind the exemption:

8

> Outside salesman have historically been exempt because it's very difficult to control their hours and working conditions. They set their own time, and they're on the road, they call on their customers. Rarely do you know what they're doing on an hour-to-hour basis.

Opinion Letter on Applicability of Outside Salesperson Exemption to Tract Homes Salespersons (Sep. 8, 1998), available at https://www.dir.ca.gov/dlse/opinions/1998-09-08.pdf.

Regarding the federal counterpart to the California exemption, the Tenth Circuit has explained:

> The reasons for excluding an outside salesman are fairly apparent. Such salesman, to a great extent, work individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates. In lieu of overtime, he ordinarily receives commissions as extra compensation. He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day. To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman.

*Jewel Tea Co. v. Williams*, 118 F.2d 202, 207–08 (10th Cir. 1941).

In *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785 (1999), the California Supreme Court set forth the authoritative construction of the state outside salesperson exemption. The *Ramirez* decision contrasted the state exemption with the federal counterpart and described the relevant inquiry:

> [T]he federal exemption focuses on defining the employee's "primary function," not on how much work time is spent selling. Although the federal exemption does place a 20 percent cap on nonexempt (i.e., nonsales) work, that cap does not apply to any nonsales activities that are "incidental" to outside sales, including the making of deliveries. In other words, so long as it can be shown that the individual's chief duty or primary function is making sales, then every activity in any way incidental to sales may be funneled into the exempt category and excluded from the 20 percent cap on nonexempt work.
>
> Wage Order No. 7-80, on the other hand, makes no mention of the primary function for which the person is employed. Rather, the state regulation takes a purely quantitative approach, focusing exclusively on whether the individual "works more than half the working time . . . selling . . . or obtaining orders or contracts." State law also differs from the federal regulation in that it does not contain any provision that reclassifies intrinsically nonexempt nonsales work as exempt based on the fact that it is

9

> incidental to sales. The language of the state exemption only encompasses work directly involved in "selling . . . items or obtaining orders or contracts."
>
> \*     \*     \*
>
> Having recognized California's distinctive quantitative approach to determining which employees are outside salespersons, we must then address an issue implicitly raised by the parties . . . Is the number of hours worked in sales-related activities to be determined by the number of hours that the employer, according to its job description or its estimate, claims the employee *should* be working in sales, or should it be determined by the actual average hours the employee spent on sales activity? The logic inherent in the IWC's quantitative definition of outside salesperson dictates that neither alternative would be wholly satisfactory. On the one hand, if hours worked on sales were determined through an employer's job description, then the employer could make an employee exempt from overtime laws solely by fashioning an idealized job description that had little basis in reality. On the other hand, an employee who is supposed to be engaged in sales activities during most of his working hours and falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption. A trial court, in determining whether the employee is an outside salesperson, must steer clear of these two pitfalls by inquiring into the *realistic* requirements of the job. In so doing, the court should consider, first and foremost, how the employee actually spends his or her time. But the trial court should also consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job.

*Id.* at 797, 801–02 (1999) (citations omitted). "Considerations such as 'the employer's realistic expectations' and 'the actual overall requirements of the job' are likely to prove susceptible of common proof." *Sav-On Drug Stores, Inc. v. Super. Ct.*, 34 Cal. 4th 319, 337 (2004) (citation omitted).

Although the *Ramirez* opinion states how courts must determine the number of hours employees spend on outside sales activities, the opinion does not give clear guidance on what constitutes a sale. *D'Este v. Bayer Corp.*, 565 F.3d 1119, 1123 (9th Cir. 2009). Neither do the California wage orders nor our court of appeals provide further definitions for what constitutes a sale. *Ibid.* In *Bayer Corp.*, a class action involving misclassification of employees, the plaintiff argued that employees must "consummate their own sales" to be considered outside

10

1    salespersons. *Ibid.* By contrast, the defendant argued that employees who "engage in any part

2    of the multiple-step process of selling or obtaining orders," regardless of whether they close

3    sales or receive orders, are exempt outside salespersons. *Ibid.* Our court of appeals found that

4    "the plain language of the [outside salesperson exemption] is susceptible to both

5    interpretations." *Ibid.* Ultimately, our court of appeals declined to rule on the issue of what

6    constitutes a sale and certified the issue to the California Supreme Court. *Id.* at 1124. The

7    California Supreme Court declined to take up the question. *D'Este v. Bayer Corp.*, No.

8    S172832 (June 10, 2009), docket available at

9    https://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=0&doc_id=1907570&doc

10   _no=S172832&request_token=NiIwLSEmTkg9WzBRSCM9XEtIQFQ0UDxfJCI%2BJzlTUC

11   AgCg%3D%3D.

12   In the absence of binding authority elaborating on the definition of sale after the *Ramirez*

13   decision, this order finds useful the opinion in *Barnick v. Wyeth*, 522 F. Supp. 2d 1257 (C.D.

14   Cal. October 25, 2007) (Judge Stephen V. Wilson). In *Barnick*, the plaintiff brought a class

15   action against the defendant pharmaceutical company, claiming the defendant misclassified

16   certain employees as exempt under the outside salesperson exemption. *Id.* at 1258–60. The

17   district court stated the following regarding what constitutes a sale:

> If an employee directs his efforts at persuading a particular customer to purchase a product and is compensated on the basis of his success in doing so then the employee is clearly engaged in sales activity and not mere general promotion of the product. Whether or not the employee at the close of the conversation requests some sort of commitment rather than leaving the customer to make that decision at a later time should not by itself transform the general nature of the employee's efforts from sales to promotion. This is particularly so when, as in the case, it has not been alleged that any other employee will affirmatively make further contact with the customer to consummate the sale. The distinction between sales and promotion is more logically made dependent on whether an employee's efforts are directed at persuading particular individuals to purchase a product rather than the general public and whether an employee is compensated based on the employee's success in securing purchases from particular individuals.

27   *Id.* at 1264–65. The district court classified the plaintiff as an exempt outside salesperson

28   because the plaintiff was hired based on his sales experience, he received regular specialized

11

sales training at sales conferences, he solicited new business, and his pay was based partially on sales he generated. *Id.* at 1263. Although the plaintiff was engaged in only indirect sales of pharmaceutical products to physicians, the district court noted that physicians "control the product's ultimate purchase" and are "appropriately the target for sales efforts and appropriately considered [defendant]'s customers." *Id.* at 1264.

The *Barnick* decision aligns with the *Ramirez* decision. The California Supreme Court stated that sales activity encompasses work "*directly involved* in 'selling . . . items or obtaining orders or contracts.'" *Ramirez*, 20 Cal. 4th at 797 (emphasis added). Work that is merely "*incidental to* sales" is not classified as exempt under California law. *Ibid.* (emphasis in original). Similarly, Judge Wilson stated that whether an employee's efforts are "*directed at persuading particular individuals* to purchase a product" is central to the distinction between sales and promotion. *Barnick*, 522 F. Supp. 2d at 1265 (emphasis added). This order will use the *Barnick* decision to aid its analysis below.

### B.   COMMON QUESTIONS PREDOMINATE AS TO THE CLASSIFICATION ISSUE.

"When appropriate, an action may be brought or maintained as a class action with respect to particular issues." FRCP 23(c)(4). Issue certification is appropriate when "adjudication of the certified issues would significantly advance the resolution of the underlying case, thereby achieving judicial economy and efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1229 (9th Cir. 1996). A court may consider other methods, such as procedural alternatives, for adjudicating the claims in a case. *See id.*; 2 Newberg on Class Actions § 4:91 (5th ed. 2021). Issue certification requires that common questions predominate over individual questions with respect to only the specific issue that is certified. *Valentino*, 97 F.3d at 1234.

#### *(i)   Company-wide Policies Governed How CSDs Spent Their Time.*

Here, the classification issue is a common issue susceptible of common proof. Below is a list of uniform, company-wide policies that governed how CSDs spent their work time:

- CSDs had to work full-time for at least five consecutive days each week (Bedell Dep. 28).

12

- CSDs had to be available to respond to inquiries between 7:00 a.m. and 9:00 p.m. (Bedell Dep. 158).
- CSDs had to respond within four hours of receiving an inquiry (Bedell Dep. 158).
- CSDs had to record all their sales activities in a common database every day by choosing from a common set of categories (Floyd Dep. 110).
- CSDs had targets for the number of sales calls they had to make each week (Bedell Dep. 60, 64).
- CSDs had to provide tours at the communities to prospective residents (Floyd Dep. 98).
- CSDs had common guidelines for how they could structure their workdays (Dkt. No. 31-2, Exh. 11).

Further, the job description that plaintiff signed stated that all CSDs must develop relationships with potential referral sources by conducting field visits (Stickles Dep., Exh. 5). These referral sources included health care providers, persons at trade shows and networking events, real estate agents, and local organizations (Bedell Dep. 39, 41, 49). Regional vice presidents advised CSDs that "the best way to lease apartments was to get professional referrals" (Rhodes Dep. 79).

There is common evidence of whether CSD interactions with referral sources constituted sales: none of the referral sources controlled the market for move-ins (*see* Bedell Dep. 40–41, 75–76), and the referral sources did not pay defendants for living spaces at the communities (*id.* at 75–76). Rather, defendants hoped that, by fostering relationships with referral sources, the referral sources would recommend defendants' living communities to seniors (*id.* at 41).

*(ii)    CSDs Had Uniform Work Duties and Experiences.*

In addition, the common proof that plaintiff offers, including the CSD job description, the depositions of two of defendants' vice presidents of sales (Melanie Bedell and Jamie Floyd), and the deposition of a member of defendants' Business Optimization Team (Jan Heffernan),

13

1  establishes the following uniform work duties and experiences that will allow class-wide
2  adjudication of the classification issue:

- All CSDs reported to and were supervised by executive directors (Bedell Dep. 15–16).
- CSDs underwent uniform standardized training upon hiring (Bedell Dep. 113).
- CSDs received flat salaries and were subject to a uniform commission and bonus plan (Heffernan Dep. 15–16).
- CSDs received commissions based on total company revenue — not based on their personal involvement in securing new customers (Floyd Dep. 103).
- When CSDs secured move-in commitments, other non-CSD employees always made further contact with customers to consummate sales by providing and executing lease documents (Bedell Dep. 89–90).
- CSDs were subject to uniform policies and procedures for responding to inquiries and conducting tours (Floyd Dep. 16–17; Bedell Dep. 23–24).
- CSDs were expected to never involve themselves in the lease-signing process (Bedell Dep. 90).
- CSDs were assigned offices at the communities and had to give notice whenever they left the communities (Bedell Dep. 31, 121–22).
- Defendants never disciplined CSDs for spending less than a majority of their time on outside sales activities (Bedell Dep. 75).

14

- More than 57 percent of CSD workweeks in the common database included three or more days with at least one entry for a community tour (Kriegler Decl. ¶ 10).
- More than ninety percent of CSD workweeks in the common database had no entries for visits to seniors at homes, hospitals, or rehabilitation facilities (Kriegler Decl. ¶ 10).

This order stresses that its finding of predominance does not rest solely on defendants' uniform exemption policy. Rather, defendants' company-wide policies and uniform duties for CSDs are examples of "centralized rules . . . suggest[ing] a uniformity among employees that is susceptible to common proof." *In re Wells Fargo*, 571 F.3d at 958–59. There was "standardized hierarchy, standardized corporate policies and procedures governing employees, uniform training programs, and other factors susceptible to common proof." *Vinole*, 571 F.3d at 946. And the common database will aid our determination of how much time CSDs actually spent on different types of work activities, such as "deposit," "lease signing," "professional sales call," "home visit," and "hospital/rehab visit" (*see* Floyd Dep., Exh. 5). Thus, there is sufficient common proof of defendants' "realistic requirements" to resolve the classification issue on a class-wide basis. *Ramirez*, 20 Cal. 4th at 802.

### C. ADJUDICATION OF THE CLASSIFICATION ISSUE WILL SIGNIFICANTLY ADVANCE RESOLUTION OF THE CASE.

The classification issue is necessarily central to plaintiff's claims, and one of defendants' affirmative defenses relies on this issue. Thus, adjudication of the classification issue will significantly advance resolution of this case as a whole.

### D. THERE ARE NO SUPERIOR PROCEDURAL ALTERNATIVES.

There are no superior procedural alternatives to certification of a class of CSDs with respect to the classification issue. As shown above, common questions predominate and class-wide adjudication will enhance judicial economy, so a class action is superior to individual actions. Moreover, the class members' individual monetary claims are small relative to the

15

costs of litigating them, which weighs in favor of trying them on a class-wide basis rather than on an individual basis.

### E. DEFENDANTS' ARGUMENTS CHALLENGING PREDOMINANCE AND SUPERIORITY ARE UNPERSUASIVE.

Defendants' primary response to plaintiff's motion for class certification is that variation in individual CSD experiences refutes predominance, and the CSD job description does not serve as common proof (Opp. 11). On this point, our court of appeals has stated:

> Where . . . there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have routinely certified classes of employees challenging their classification as exempt, despite arguments about 'individualized' differences in job responsibilities.

*In re Wells Fargo*, 571 F.3d at 958 (citation omitted). Thus, although this order acknowledges that there may be variation in the actual work performed by CSDs, the company-wide policies and uniform work duties discussed above show there are "comprehensive procedures and policies" in place allowing class-wide adjudication of this matter. *Ibid.* (citation omitted). And plaintiff has also presented common proof of how CSDs actually spent their time in the form of statistics.

Further, defendants argue that common questions do not predominate because the common database did not track CSD time, so it is impossible to determine how much time CSDs actually spent on outside sales activities without resorting to individual inquiries (Opp. 14). And defendants argue that plaintiff's expert did not have a methodology for tracking CSD time, and the average and weekly frequencies of CSD work amount to "pure speculation" (*id.* at 16). The relevant inquiry under *Ramirez*, however, is not how the employee actually spends his or her time but the "realistic requirements" of the job. 20 Cal. 4th at 802. Although the way an employee actually spends his or her time is, perhaps, the most probative indicator of the realistic requirements of the job, the employer's realistic expectations and the actual overall requirements of the job are also relevant. *Ibid.* Here, there is sufficient common proof to determine defendants' realistic expectations and the actual overall requirements for the CSD position. These primary determinations will permit a finding of the realistic requirements of

16

the CSD position for purposes of the classification issue. And although the *Ramirez* decision cautions against using averages to determine employee classification, this order stresses that it does not rely solely on statistics in concluding that common issues predominate. The statistics that plaintiff's expert provided merely support the conclusion here.

In addition, defendants provide numerous unavailing reasons for why plaintiff's expert performed an unreliable analysis of the CSD data (Opp. 15). Defendants argue that plaintiff's expert did not analyze CSD entries for "assessment," but deposition testimony reveals that performing an "assessment" is not part of the CSD job duties (Bedell Dep. 89, 162). Defendants also argue that the expert's analysis omits "most of the *non*-outside sales tasks recorded in the data," but defendants do not provide any examples of such tasks (Opp. 16) (emphasis in original). Further, defendants argue that the data is inherently flawed because defendants did not require CSDs to record networking events, trade shows, and various meetings in the common database (*ibid.* n. 7). But it is unlikely that these types of events qualified as outside sales activities, as these events seem to have involved only indirect sales opportunities (*see* Bedell Dep. 38–39). Additionally, defendants argue that the expert's analysis is flawed because it contains entries by CSDs who signed arbitration agreements (Opp. 17). Yet defendants do not explain *how* the inclusion of this data makes the analysis unreliable. Defendants do not assert that there was any difference in duties between CSDs who signed arbitration agreements and those who did not.

Defendants also argue that, unlike in *Troyer v. The Yerba Mate Co., LLC*, in which the employer maintained a software application that tracked employee hours, here, the common database did not track CSD hours. No. 20-06065, 2021 WL 2662109 at *7 (N.D. Cal. June 29, 2021). *Troyer* did not hinge on the amount of time data available. Rather, the *Troyer* decision rested on company-wide policies governing how employees spent their time and common proof of uniform work experiences. So too here. The lack of time data does not preclude class certification because there are sufficient company-wide policies and common proof of uniform work duties and experiences to resolve the classification issue.

17

Finally, defendants' argument that plaintiff's failure to submit a trial plan precludes class certification is meritless. Defendants assert that our court of appeals vacated the certification order in *Valentino* because the plaintiffs did not show "how the class trial could be conducted." 97 F.3d at 1234. That is not true. The underlying reason for vacating the order was that it was "silent as to any reason why common issues predominate[d] over individual issues . . . ." *Valentino*, 97 F.3d at 1234. Moreover, our court of appeals has clarified that the *Valentino* decision did not consider failure to adopt a trial plan at class certification an abuse of discretion. *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 n. 4 (9th Cir. 2005). Because plaintiff has demonstrated that common questions predominate here, plaintiff's failure to provide a trial plan is not fatal.

Predominance and superiority are satisfied.

## CONCLUSION

A class of CSDs who did not sign arbitration agreements and whom defendants classified as exempt outside salespersons from the date plaintiff Stickles began his employment with defendants through September 29, 2019 is **CERTIFIED**. For now, certification applies solely to this issue: whether defendants properly classified CSDs as exempt outside salespersons.

Plaintiff George Stickles is **APPOINTED** representative of the class.

Hayes Pawlenko LLP is **APPOINTED** counsel for the class.

**WITHIN TWO WEEKS OF THIS ORDER**, the parties shall file a joint proposed class notice together with a plan of distribution and timeline for opt out. The proposed notice should conform to FRCP 23(c)(2)(B).

**IT IS SO ORDERED.**

Dated: December 27, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE